UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FERNANDEZ and JOEY
FERNANDEZ,

                    Plaintiffs,

          - against -

THE CITY OF NEW YORK; POLICE
OFFICER MARCO PADILLA, Shield No.
25056.1; POLICE OFFICER SERGEANT
DANNY AGUILAR, Shield No. 2496;
POLICE OFFICER "FNU" RODRIGUEZ;
JOHN DOE #1; JOHN DOE #2; POLICE
SERGEANT ELLIOTT ZINSTEIN;
POLICE OFFICER "FNU" FREEMAN,
Shield No. 19103; POLICE OFFICER RENE
CALZADA, Shield No. 23232; POLICE
OFFICER ELBERT TIM, Shield No. 15162;
JOHN DOES and RICHARD ROES,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 789 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiffs Joey and David Fernandez bring Section 1983 and state law claims

against several New York City Police Department ("NYPD") officers and the City of New York

(the "City").  (Second Am. Cmplt. ("SAC") (Dkt. No. 29) at 11-21)  The claims arise from a

November 3, 2015 incident in which Plaintiffs – who are brothers – had an argument at Joey

Fernandez's home, during which Joey injured David.  David called 911, an ambulance arrived,

and David was treated for his injuries.  NYPD officers also arrived at the scene, and arrested

both brothers.

          The parties have filed cross-motions for summary judgment.  (Dkt. Nos. 77, 84)

Defendants have also moved to seal a document submitted in connection with their motion.

(Dkt. No. 95)  For the reasons stated below, Plaintiffs' motion for summary judgment will be granted in part and denied in part, and Defendants' motion for summary judgment will be granted in part and denied in part.  Defendants' motion to seal will be granted.

## BACKGROUND[1]

### I.    FACTS

#### A.    NYPD Response to David's 911 Call

Plaintiff Joey Fernandez lived in a rented bedroom in an apartment at 1199 Boston Road in the Bronx.[2]  He shared the common areas of the apartment with other tenants. (Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶¶ 1-2)  Separate keys were necessary to enter the apartment and Joey's bedroom.  (Id. ¶ 3)

On the evening of November 2, 2015, Plaintiff David Fernandez slept on the floor of Joey's bedroom, next to a bed that Joey was sharing with his girlfriend Keisha Caraballo.  (Id. ¶¶ 22-24)

In the early morning hours of November 3, 2015, Joey had an argument with David, which led to Joey kicking his bedroom door.  (Id. ¶¶ 5-6)  The door fell off its hinges and struck David in the face, causing his nose to bleed.  (Id. ¶¶ 7-8)  David left the apartment, went outside the apartment building, and called 911 for medical care, "yelling on the phone that his

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1.1 statement, that fact will be deemed admitted." (citations omitted)).  Where a non-movant disputes a movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed.

[2]  The record does not provide a description of the building located at 1199 Boston Road.

nose was bleeding and that he needed an ambulance."[3]  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 85-87) (Id. ¶ 88)  At 7:18 a.m., an ambulance arrived, and David received medical care outside the building.  (Id. ¶ 91)

NYPD officers Tim and Padilla reported to the scene at 7:23 a.m., and spoke with David outside the building.[4]  (Id. ¶¶ 101-03)  Tim and Padilla then entered the apartment building.  (Id. ¶¶ 106)

NYPD Sergeant Zinstein and Officer Freeman then arrived at the scene, and they also entered the apartment building.  (Id. ¶¶ 105, 107)  The record does not reveal which officers first arrived at Joey's apartment, but the parties agree that two unidentified officers knocked on the door of Joey's apartment.  (Id. ¶¶ 109-10)

According to Joey, "the superintendent of his apartment building [then] opened Joey's apartment door for the police and let [the officers] into Joey's apartment."  (Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶ 14)  Officer Tim and Sergeant Zinstein entered Joey's apartment.[5]  (Def. R.

---

[3]  The recording of David's 911 call is unavailable, and Plaintiffs deny that a 911 Sprint Report cited by Defendants refers to the incident in question, because the phone number referenced in the report is not David's phone number.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 86)  The Sprint Report cited by Defendants indicates that David's 911 call was received at 7:12 a.m., and that at 7:13 a.m., "a dispatcher transmitted a 10-34 (the radio code for an assault in progress) and also requested an ambulance."  The report indicates that at 7:18 a.m., "David called 911 again to say in sum and substance that he was still waiting for the police."  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 86-89)

[4]  The parties disagree as to what David told the officers.  David claims that he told the officers that he had not called the police.  When asked whether he wanted to press charges, David told the officers that he did not.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 233-35)  Defendants claim that "David told Officer[s] Tim and Padilla that he had been assaulted by his brother . . . [and] that 'his brother had punched him in the face and he [David] wanted him arrested.'"  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶¶ 233, 235 (last alteration in original))  Officers Tim and Padilla observed that David had facial injuries.  (Def. Add'l R. 56.1 Stmt. (Dkt. No. 94) ¶ 722)

[5]  Defendants claim that "Officer Freeman remained outside the apartment the entire time" and "didn't know what was going on inside the apartment."  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 113-14)  However, Plaintiffs dispute these assertions, noting that Officer Tim testified that he entered the apartment with Officer Freeman.  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶¶ 113-14)

56.1 Stmt. (Dkt. No. 86) ¶ 113; Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶ 42)  "Joey told the police that

they were not permitted to enter his bedroom."[6]  (Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶ 14)

### B.   Inside the Apartment

Joey then had a conversation with certain unidentified police officers about his

argument with David.  (Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶¶ 13-14)  Joey told the officers that "he

had an argument with David, and that he – Joey – had kicked the bedroom door off of its hinges

. . . and it struck David in the face[,] injuring his nose."[7]  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶

116-17)

From the doorway to Joey's bedroom, Sergeant Zinstein observed the broken

bedroom door, which was laying on the floor.  (Id. ¶ 118)  An unidentified officer then "stepped

into Joey's bedroom, looked at the door which was laying on the floor, picked it up and put it

against the wall, spoke to his partner and stepped out of the bedroom."  (Id. ¶ 119)  Officer Tim

and Sergeant Zinstein then entered the bedroom.  (Id. ¶¶ 120-21)  The Defendant officers claim

that Joey never told them not to enter the bedroom (id. ¶ 122), but Joey claims that he "told the

police officers that they were not allowed to enter his room," and that Keisha "was in the room

---

Defendants also claim that "Officer Padilla talked to Joey at the door of the apartment and never
entered."  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 115)  Plaintiffs dispute this assertion, noting that
"Padilla is listed as Joey's arresting officer. . . . [and that] Joey recalls a Hispanic officer entering
his apartment, and his bedroom within the apartment, and handcuffing him in his bedroom. . . .
Padilla is Hispanic."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 115)

[6]  At his deposition, Joey testified that "[o]nce [the superintendent] opened the door for [the
officers] he was, like, basically they free to do whatever."  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶
112) (citing Joey Dep. Tr. (Dkt. No. 88-5) at 50:10-11)

[7]  Defendants claim that "Officer Tim spoke to Joey regarding David's complaint that Joey
assaulted him," and "Zinstein spoke to Keisha regarding the incident between David and Joey."
(Def. R. 56.1 Am. Cntrstmt. (Dkt. No. 104) ¶ 28)  Plaintiffs do not dispute that Officer Tim
spoke with Joey, but they claim that Keisha's only conversation with the officers "was her asking
to be permitted to get dressed, and the police did not respond to her query."  (Pltf. R. 56.1
Cntrstmt. (Dkt. No. 96) ¶ 120)

wearing only her panties and bra."  (Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶¶ 18-19)

C.     **Joey's Arrest**

Sergeant Zinstein then instructed other unidentified officers to arrest Joey.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 123-24)  Defendants claim that Officer Tim handcuffed Joey (id. ¶ 126), but Joey "has identified a Hispanic Officer, likely, Padilla, as having handcuffed him. . . . Officer Tim looks Filipino."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 126)

Officers Tim and Freeman walked Joey out of the apartment building, toward a police vehicle.[8]  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 128-29)  Joey tried to speak with another officer, but was pushed towards Freeman and Zinstein's police vehicle.  Joey resisted being placed in the car.  (Id. ¶¶ 130-31)  Force was used, but the parties dispute which officers used force, how much force was used, and when it was used.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶¶ 133-50)  The parties agree that Joey was placed in a chokehold and punched while in the police car; that he was removed from the car; and that he was then kicked at least "a couple" times before being carried to a second police car.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 143, 147, 149)

D.     **David's Arrest**

Sergeant Zinstein, Officer Padilla, and other officers then approached the front of the apartment building, where David was standing.  (Id. ¶ 157)  Sergeant Zinstein instructed Officer Padilla to arrest David "based on his observations of the door, [and] his conversation with the female in the bedroom and [Officer Tim]."[9]  (Id. ¶¶ 123, 158)  Officer Padilla then

---

[8]  Plaintiffs claim that four officers "were with Joey when he was brought out of the building." (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 276)
[9]  Defendants claim that Caraballo "described [to Sergeant Zinstein] that Joey broke the door, and Joey and David had a physical altercation."  (Id. ¶ 120)  Plaintiffs dispute this assertion. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 120)  Defendants do not describe Sergeant Zinstein's conversation with Officer Tim.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 120)

handcuffed David.  (Id. ¶ 159)  After being handcuffed, David stood near the ambulance for two

to five minutes.  (Id. ¶ 161)  Joey was then brought out of the apartment building.  (Id. ¶ 170)

Once Joey was brought outside, both David and Joey began yelling that they were

not pressing charges.  (Id. ¶ 171; Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 301-02)  Plaintiffs

also claim that they were yelling about the force officers were using on Joey.[10]  (Id. ¶¶ 303-04)

Officer Padilla brought David to a police vehicle and attempted to put him in the

rear seat, but David resisted.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 163, 165)  The parties dispute

which officers used force, how much force was used, and when it was used.  It is undisputed that

David's nose came into contact with the police vehicle, but the parties dispute how that

happened.  Defendants say that David accidentally "bump[ed]" his nose into the car, while

Plaintiffs say that Officer Padilla "slam[med]" David's nose into the car.[11]  (See Def. R. 56.1

Stmt. (Dkt. No. 86) ¶¶ 166-67; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶¶ 166-67)

Defendant Officers Calzada and Rodriguez arrived at the scene after Joey and

David had been placed in handcuffs.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 176)

### E.   Post-Arrest Events at the 42nd Precinct

Joey arrived at the 42nd Precinct at 7:45 a.m. and was thrown on the floor by

unidentified officers, in front of the desk where Sergeant Aguilar, the desk sergeant, was

---

[10]  Defendants assert that neither Joey nor David complained about the use of force before Joey
was placed in a police vehicle.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶¶ 303-04)

[11]  At deposition, David testified that the officers "were pushing and shoving, and as they were
trying to force me into the squad car I hit my nose again onto the squad []car."  (D. Fernandez
Dep. (Dkt. No. 88-6) at 71:21-23)  David's St. Barnabas Hospital records for November 3, 2015
report that David said that he had "nose pain where he said a police officer slammed his face into
the cop car."  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 265 (citing Rothman Decl., Ex. 14 (Dkt.
No. 97-6) at 1))

sitting.[12]  (Id. ¶¶ 180-81; Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 353-54; Def. R. 56.1

Cntrstmt. (Dkt. No. 94) ¶ 378)  Joey was then searched and placed in a cell.  (Def. R. 56.1 Stmt.

(Dkt. No. 86) ¶ 181)  While Joey was in a cell at the 42nd Precinct, Sergeant Aguilar was the

only named Defendant in the vicinity.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 378-79)

    Joey requested medical treatment.  Officers called for an ambulance, and Joey

was taken to Lincoln Hospital.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 201, 204)

    David arrived at the 42nd Precinct at 7:48 a.m., and was put into a cell while still

in handcuffs.  (Id. ¶¶ 185-86)  He was later taken to a hospital.  (Id. ¶ 189)  At David's request,

officers loosened his handcuffs on the way to the hospital.  (Id. ¶ 190)  While David was in a cell

at the 42nd Precinct, Sergeant Aguilar was the only named Defendant in the vicinity.  (Pltf.

Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 378-79)

## F.   Medical Treatment and Alleged Injuries

    The parties dispute how long Joey and David were in their cells before being

brought to a hospital; what complaints of pain they made after arriving at the hospital; the

medical examinations that took place and the diagnoses that were made at the hospital; and the

injuries that Joey and David had suffered.  (See Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶¶ 190-200,

205-208)

    As to Joey, Defendants assert that an ambulance was called at 7:52 a.m., arrived

at the precinct at 8:26 a.m., and left for the hospital at 8:45 a.m.  (Def. R. 56.1 Stmt. (Dkt. No.

---

[12]  Plaintiffs allege that Joey "fell hard face-down on the ground" and "slid about two feet to the
front of the desk."  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 353-54)  Plaintiffs further claim
that Joey was "beaten up further while he was on the floor. . . ."  (Id. ¶ 363)  While Defendants
admit that Joey was "thrown" to the floor in front of the desk, they claim that Sergeant Aguilar
"did not see any of the other officers treat either Joey or David with any degree of roughness
. . . ."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶¶ 353-54, 363)

86) ¶ 202)  According to Defendants, Joey was in a cell at the precinct for 35 minutes before being brought to a hospital, and was in a cell for another two hours and 45 minutes after his return from the hospital.  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶ 368)  Plaintiffs assert that Joey was in a cell for "approximately three to five [] hours."  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 368)

At Lincoln Hospital, Joey was treated for "a forehead contusion"; "a left ear abrasion"; "minor head trauma"; "visible bruising on [his] forehead"; and an "abrasion to [the] anterior aspect of [his right] wrist."  He was given pain medication.  (Id. ¶¶ 467-73)  The contusion on Joey's forehead took about two weeks to heal.  (Id. ¶ 477)[13]  Joey was examined at St. Barnabas Hospital on November 7, 2015 – four days after his arrest.  His records from that visit show that he complained of back pain and headache, and was diagnosed with a concussion. (Id. ¶¶ 483-87)

As for David, Defendants claim that an ambulance arrived at the 42nd Precinct at 8:01 a.m.; that David arrived at Bronx Lebanon Hospital at 8:57 a.m.; and that David was discharged from the hospital at 10:20 a.m.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 191)  Plaintiffs contend, however, that David was left in his cell "for an extended period of time handcuffed before being transported to the hospital."  (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 191)

Plaintiffs do not describe the treatment David received at Bronx Lebanon Hospital.  After his release from the 42nd Precinct on November 3, 2015, however, David was treated at St. Barnabas Hospital.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 423)  At St.

---

[13]  Relying on Caraballo's deposition, Joey also claims that he had wrist swelling, increasing wrist pain, and headaches three times per month through February 2019.  (Id. ¶¶ 478-81)  Caraballo's testimony on this point constitutes inadmissible hearsay and will not be considered by the Court.

Barnabas, David was diagnosed with a "bilateral nose fracture without displacement."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶ 425 (citing Myrvold Decl., Ex. T (Dkt. No. 93-2) at 20); Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 425)  David returned to St. Barnabas on November 9, 2015, and records for that visit state that David had suffered head trauma.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 448)

David also sought medical treatment at Henry Ford Hospital in Dearborn, Michigan in December 2016 – about a year after the incident.  At that time, David complained of "injuries to his hands," including "tingling and an absence of sensation when he opened his hand."  David was diagnosed with carpal tunnel syndrome.  (Id. ¶¶ 428-30, 451)  As of May 2018, David continued to suffer pain in his right wrist.  (Id. ¶¶ 433-38)

### G.   Declination

On the afternoon of November 3, 2015, Joey and David were brought to Bronx Central Booking.  The Bronx County District Attorney's Office declined to prosecute.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 209-212)  David was released from Bronx Central Booking at 4:00 p.m.  (Id. ¶ 211)  Joey was re-arrested on unrelated charges, however, and was taken to a police precinct in Brooklyn.  (Id. ¶ 213, 215)

## II.   PLAINTIFFS' CLAIMS

The SAC alleges fourteen claims.  The First Cause of Action is brought under Section 1983 against all individual Defendants, and is for

> falsely arresting and imprisoning, abusing process against, assaulting and battering, violating the rights to due process of, neglecting the medical needs of, violating and retaliating for the exercise of free speech and association of, unlawfully searching and seizing, failing to intercede on behalf of, and fabricating an account and/or evidence with regard to, Plaintiffs . . . .

(SAC (Dkt. No. 29) ¶ 70)

The Second Cause of Action, also brought under Section 1983, is against

Sergeants Zinstein and Aguilar for "failing to remedy the wrongs committed by their subordinates, and in failing to properly train, screen, supervise, or discipline their subordinates . . . ."  (Id. ¶ 73)

The Third Cause of Action is a Monell claim against the City.  (Id. ¶¶ 76-81)

The Fourth Cause of Action is a respondeat superior claim against the City of New York.  (Id. ¶¶ 83-84)

The Fifth Cause of Action is brought against all Defendants for state law assault and battery.  (Id. ¶¶ 86-87)

The Sixth Cause of Action is brought against all Defendants for state law false arrest and false imprisonment.  (Id. ¶¶ 89-90)

The Seventh Cause of Action is brought against all Defendants for violation of Plaintiffs' right to equal protection under New York law.  (Id. ¶¶ 92-93)

The Eighth Cause of Action is brought against all Defendants for violation of Plaintiff's right to free speech and assembly under New York law, and for retaliation for the exercise of free speech and assembly rights under New York law.  (Id. ¶¶ 95-96)

The Ninth Cause of Action is brought against all Defendants for abuse of process under New York law.  (Id. ¶¶ 98-99)

The Tenth Cause of Action is brought against all Defendants for trespass under New York law.  (Id. ¶¶ 101-02)

The Eleventh Cause of Action is brought against all Defendants for intentional and negligent infliction of emotional distress under New York law.  (Id. ¶¶ 104-05)

The Twelfth Cause of Action is brought against all Defendants for negligence under New York law.  (Id. ¶¶ 107-08)

The Thirteenth Cause of Action is brought against the City for negligent hiring, screening, retention, supervision, and training under New York law.  (Id. ¶¶ 110-11)

The Fourteenth Cause of Action is brought against all Defendants for a constitutional tort under Article I, §§ 6, 8, 11, and 12 of the New York State Constitution.  (Id. ¶¶ 113-15)

## III.   PROCEDURAL HISTORY

The Complaint was filed on February 1, 2017 (Cmplt. (Dkt. No. 1), and the SAC was filed on September 6, 2017.  (Dkt. No. 29)

Defendants have moved for summary judgment on the following claims:  (1) Section 1983 and state law false arrest; (2) First Amendment retaliation; (3) Section 1983 and state law malicious abuse of process; (4) Section 1983 and state law denial of fair trial and fabrication of evidence; (5) Section 1983 excessive force; (6) Section 1983 supervisory liability; (7) Monell liability; and (8) all remaining state law claims.  (Dkt. No. 77 (Def. Mot.); Def. Br. (Dkt. No. 85))  Defendants have also moved to seal certain portions of Plaintiffs' Rule 56.1 submissions.  (Dkt. No. 95)

Plaintiffs have moved for summary judgment on:  (1) Joey's Section 1983 and state law claims for warrantless entry; (2) Joey's Section 1983 and state law claims for false arrest; (3) Joey's respondeat superior claims against the City for Joey's state law false arrest, trespass, and New York State Constitution § 12 claims.  (Dkt. No. 84 (Pltf. Mot.); Pltf. Br. (Dkt. No. 80))

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.1(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56.1 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'"  Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456.1 (2d Cir. 1995)).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citation omitted).

## II.    WARRANTLESS ENTRY AND TRESPASS CLAIMS

Plaintiffs have moved for summary judgment on Joey's claims against Sergeant Zinstein and Officer Tim for warrantless entry of Joey's apartment under the Fourth Amendment, and for trespass under New York law.  (Pltf. Br. (Dkt. No. 80) at 6, 15)  Plaintiffs have also moved for summary judgment against the City on these claims under the doctrine of respondeat superior.  (Id. at 16)

### A.    Applicable Law

To state a claim under Section 1983, a complaint must plead facts demonstrating that defendant (1) deprived plaintiff of rights secured by the Constitution and laws of the United States, (2) while acting under color of state law.  See 42 U.S.C. § 1983; see also Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 381 (S.D.N.Y. 2013).  The Fourth Amendment protects individuals and their homes against unreasonable searches and seizures, see U.S. Const. Amdt. IV, and "[t]o be reasonable under the Fourth Amendment, a search of a home must either be conducted pursuant to a warrant or meet an exception to the warrant requirement." Anthony v. City of N.Y., 339 F.3d 129, 135 (2d Cir. 2003).

"Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person," United States v. Snype, 441 F.3d 119, 130 (2d

13

Cir. 2006) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)), or where there are

exigent circumstances.  <u>See</u>, <u>e.g.</u>, <u>Loria v. Gorman</u>, 306 F.3d 1271, 1283 (2d Cir. 2002).

       A third party "has authority to consent to a search of a home when that person (1)

has access to the area searched and (2) has either (a) common authority over the area, (b) a

substantial interest in the area, or (c) permission to gain access to the area."  <u>Moore v. Andreno</u>,

505 F.3d 203, 208-09 (2d Cir. 2007)  Where a search premised on third-party consent is

challenged, courts "ask whether a police officer's objectively reasonable belief that he has

obtained consent, even if in fact he has not, renders a search constitutional. . . . That is, even if a

third party lacks actual authority to consent to a search of a particular area, he still may have

apparent authority to consent to the search."  <u>Id.</u> at 209 (citing <u>Illinois v. Rodriguez</u>, 497 U.S.

177, 188 (1990)).

       "However, the <u>Rodriguez</u> apparent authority rule applies [only] to mistakes of fact

[and] not mistakes of law. . . . <u>Rodriguez</u> would not validate . . . a search premised upon an

erroneous view of the law.  For example, an investigator's erroneous belief that landladies are

generally authorized to consent to a search of a tenant's premises could not provide the

authorization necessary for a warrantless search."  <u>Id.</u> (internal quotation marks and citations

omitted) (alterations in original); <u>see also</u> <u>United States v. Brown</u>, 961 F.2d 1039, 1041 (2d Cir.

1992) (officer's conclusion that because landlord "was authorized to enter [defendant's]

apartment when necessary to turn off electrical appliances or lights, she could consent to a search

of his apartment" was "not a reasonable, although factually erroneous, belief based upon the

facts presented to the officer, but rather a misapprehension of the applicable rule of law")  "A

person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no

customary understanding of authority to admit guests without the consent of the current

occupant. . . . A tenant in the ordinary course does not take rented premises subject to any formal or informal agreement that the landlord may let visitors into the dwelling . . . ." Georgia v. Randolph, 547 U.S. 103, 112 (2006) (citing Chapman v. United States, 365 U.S. 610 (1961)).

Building superintendents likewise lack the authority to consent to a search of a tenant's apartment. See, e.g., United States v. Turner, 23 F. Supp. 3d 290, 308 (S.D.N.Y. 2014) ("[c]ourts have consistently rejected the authority of superintendents, landlords, and hotel managers to consent to searches of property occupied by tenants and hotel guests"; granting motion to suppress in part because "a superintendent . . . could not consent to a search of the apartment"); United States v. Penaloza-Romero, No. CRIM. 13-36 RHK/TNL, 2013 WL 5472283, at *8 (D. Minn. Sept. 30, 2013) ("a building manager does not have the authority to consent to a search of a tenant's dwelling") (citing Chapman, 365 U.S. at 616).

As to exigent circumstances, courts "use the following factors as guides to determine whether exigent circumstances justify[] a warrantless entry":

> "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry."

Loria, 306 F.3d at 1284 (quoting United States v. Fields, 113 F.3d 313, 323 (2d Cir. 1997)).

"Under New York law, trespass is the intentional invasion of another's property . . . . To be liable, the trespasser need not intend or expect the damaging consequences of his intrusion; rather, he need only intend the act which amounts to or produces the unlawful invasion." Scribner v. Summers, 84 F.3d 554, 557 (2d Cir. 1996) (internal citations and quotations omitted). "[L]aw enforcement personnel acting lawfully in the furtherance of their duty are excused from what may be otherwise trespassory acts . . . ." Hand v. Stray Haven

Humane Soc. & S.P.C.A., Inc., 21 A.D.3d 626, 628 (3rd Dept. 2005). "[A]n individual who possesses the requisite degree of control over specific premises is vested in his own right with the authority to permit an official inspection of such premises." People v. Cosme, 48 N.Y.2d 286, 292 (1979). "The prevailing rule in this and a number of other jurisdictions is that the lessor of real or personal property lacks the requisite authority to consent to a warrantless search of the leased property." People v. Ponto, 103 A.D.2d 573, 577 (2d Dept. 1984) (collecting cases). "A landlord does not share common authority with a tenant, and, therefore, may not consent to a search." People v. Ruiz, 13 Misc. 3d 1225(A), at *3 (Bronx Cty. Sup. Ct. 2006).

      **B.**     **Analysis**

          Plaintiffs argue that "the building superintendent did not have the authority to permit the police to enter Joey's apartment, as he was not living in the apartment along with Joey and Joey's co-tenants." (Pltf. Reply Br. (Dkt. No. 83) at 6)

          Defendants argue that the building superintendent consented to the officers' entry into Joey's apartment, and that he had apparent authority to grant such consent. (Def. Am. Opp. Br. (Dkt. No. 103) at 10) "[T]he building superintendent possessed the key to the apartment and let the officers into the apartment, came into the apartment with the officers[,] and gave the police officers permission to do whatever they wanted." (Id. (citing Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 110-12)) While Defendants deny that Joey told the officers that they could not enter the apartment, they do not contend that Joey affirmatively consented to their entry. (Def. R. 56.1 Cntrstmt. (Dkt. No. 104) ¶ 16; Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 110-12)

          Defendants do not contend that the building superintendent had actual authority, under either federal or New York law, to consent to the officers' entry into Joey's apartment. They do not, for example, argue that the superintendent had "either (a) common authority over

the area, (b) a substantial interest in the area, or (c) permission to gain access to the area."
Moore v. Andreno, 505 F.3d 203, 208-09 (2d Cir. 2007).  Defendants' consent argument is
instead premised on the notion that the superintendent had apparent authority to let them in.
(Def. Am. Opp. Br. (Dkt. No. 103) at 10)

While the officers who entered Joey's apartment may have believed that the
superintendent had authority to let them in, as discussed above, this erroneous belief is a mistake
of law, not of fact.  Brown, 961 F.2d at 1041.  "[T]he Rodriguez apparent authority rule applies
only] to mistakes of fact [and] not mistakes of law."  Moore, 505 F.3d at 209.  And under both
federal and New York law, "[c]ourts have consistently rejected the authority of superintendents
. . . to consent to searches of property occupied by tenants. . . ."  Turner, 23 F. Supp. 3d at 308;
see also Ponto, 103 A.D.2d at 577 ("[T]he lessor of real or personal property lacks the requisite
authority to consent to a warrantless search of the leased property.").

In sum, Defendants' consent argument fails, because a building superintendent
lacks authority to consent to the search of a tenant's apartment.

Defendants also argue that two types of exigent circumstances justify their
warrantless entry:  the need to provide emergency aid and "hot pursuit."

As to emergency aid, Defendants assert that the officers "were responding to an
assault in progress, and that Sgt. Zinstein was waved into the building by an officer who repeated
the same thing, and advised Sgt. Zinstein that it involved a fight between two brothers in a room
in a basement apartment."  (Def. Am. Opp. Br. (Dkt. No. 103) at 11)

"The essential question in determining whether exigent circumstances justified a
warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to
render aid or take action."  United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990).

"Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998).  "Probable cause for a forced entry in response to exigent circumstances requires finding a probability that a person is in 'danger,'" however.  Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001) (quoting id.).  "Although the existence of probable cause and knowledge that the suspect is on the premises are important predicates to a finding that an entry was justified based on exigent circumstances, they are not sufficient to justify an entry where the crime involved is minor and there is no apparent potential for violence."  Loria, 306 F.3d at 1285-86.

Here, the most serious charge consistent with Joey's conduct is assault in the third degree, a misdemeanor.  (Def. Br. (Dkt. No. 85) at 14-15 (citing N.Y. Penal Law § 120.00))  As to danger and the potential for further violence, it is undisputed that the officers who entered Joey's apartment were aware that David – the alleged victim of the assault – was standing in front of the apartment building, was no longer in Joey's apartment, and thus was in no imminent danger.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 106)  Accordingly, the cases cited by Defendants (see Def. Am. Opp. Br. (Dkt. No. 103) at 11-12) – which all involve 911 calls and potential danger to putative victims – are inapposite.

Defendants do not contend that any of the officers believed that David, or anyone else, might be in danger from Joey, nor do they assert that any officer believed that the situation was still unfolding.  Indeed, the undisputed evidence shows that the verbal and physical altercation between the brothers had ended before the warrantless entry occurred.  In such circumstances, courts find a warrantless entry unlawful.  See, e.g., Santagata v. Diaz, 2020 WL

18

1536347, at *11 (E.D.N.Y. Mar. 30, 2020) (denying defendants' motion for summary judgment

on grounds of qualified immunity; "there was no exigency . . . to justify warrantless entry into

[plaintiff's r]esidence" where the officer "was told of an altercation between [p]laintiff and his

neighbors that had already ended, and then [p]laintiff locked himself inside what appeared to be

his home, refusing to come out or to be taken to the hospital or arrested"); United States v.

Calhoun, 2017 WL 1078634, at *6 (D.Conn. Mar. 21, 2017) (finding no exigent circumstances

and granting motion to suppress where, "despite the fact that [plaintiff's] actions [away from his

residence] . . . were abhorrent and violent, that situation had ended by the time the officers

arrived at his residence."); Azana v. City of West Haven, 2012 WL 264559, at *7 (D. Conn. Jan.

27, 2012) (finding on defendants' motion for summary judgment that a late-arriving defendant

officer was not entitled to qualified immunity for warrantless entry because, "[h]aving observed

that the incident was over, it was not objectively reasonable for [defendant] to believe that

exigent circumstances warranted his entry into the apartment").  In sum, the warrantless entry

cannot be justified by an "'urgent need' to render aid."  MacDonald, 916 F.2d at 769.

Defendants also argue that their warrantless entry was appropriate under the "hot

pursuit" doctrine.  (Def. Am. Opp. Br. (Dkt. No. 103) at 12)  The hot pursuit doctrine provides

"that a suspect may not defeat an arrest which has been set in motion in a public place . . . by the

expedient of escaping to a private place."  United States v. Santana, 427 U.S. 38, 43 (1976); see

also United States v. Delva, 858 F.3d 135, 153 (2d Cir. 2017) ("[a]mong the most common

exigencies found to validate entry into a home with probable cause but without a warrant are the

need to prevent the escape of a felon . . . and the need to prevent the destruction of evidence

. . . .") (internal quotation marks and citations omitted).  Here, Defendants do not contend that

Joey's arrest had been "set in motion in a public space," or that the warrantless entry was

19

necessary to prevent Joey's escape or the destruction of evidence.  Accordingly, the hot pursuit doctrine is not applicable.

As to qualified immunity, that "is an affirmative defense, [and] 'the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.'"  Tellier v. Fields, 280 F.3d 69, 84 (2d Cir. 2000) (quoting Varrone v. Bilotti, 123 F.3d 75, 78 (2d Cir.1997)).  "It is [] settled law that, at a minimum, law enforcement officers violate Payton when, in the absence of exigent circumstances or consent, they physically enter protected premises to effect a warrantless search or arrest."  U.S. v. Allen, 813 F.3d 76, 81 (2d Cir. 2016) (citing Payton v. New York, 445 U.S. 573, 585 (1980)).

Here, Defendants' qualified immunity argument is premised on consent, rather than on exigent circumstances.  (Def. Am. Opp. Br. (Dkt. No. 103) at 13-14)  As to consent, no officer could reasonably have believed that the superintendent was authorized to grant consent to search Joey's apartment.  As discussed above, superintendents' lack of authority to consent to a search of a tenant's apartment is well established law.  See Turner, 23 F. Supp. 3d at 308.  As to exigent circumstances, the facts here are such that "reasonable officers [would not] disagree as to whether exigent circumstances were present."  Loria, 306 F.3d at 1287.  Given that the altercation that led to the 911 call had ended, and that the alleged victim was safely outside the apartment building, no reasonable officer could have believed that exigent circumstances justified a warrantless entry of the apartment.  Accordingly, qualified immunity does not shield the officers from liability for the warrantless entry.

Finally, as to the City's liability under respondeat superior, Defendants' sole argument is that Plaintiffs' respondeat superior claim is derivative of Joey's state law trespass claim, which Defendants argue is meritless.  (Def. Am. Opp. Br. (Dkt. No. 103) at 20)  The

Court has found, however, that the warrantless entry was unlawful.  And "[u]nlike cases brought under § 1983, municipalities may be liable for the common law torts, like [trespass], committed by their employees under the doctrine of <u>respondeat</u> <u>superior</u>."  <u>L.B. v. Town of Chester</u>, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002) (citing <u>Loucks v. Community Home Care Servs.</u>, 618 N.Y.S.2d 826 (1994)).  Accordingly, the City is liable here for the trespass committed by Officer Tim and Sergeant Zinstein on a theory of <u>respondeat</u> <u>superior</u>.  <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 22 (2d Cir. 2012) ("[B]ecause [plaintiff's] state law false arrest claim creates liability for the [municipality defendant], under a theory of <u>respondeat</u> <u>superior</u>, [plaintiff] is also entitled to partial summary judgment as to that defendant.")

Plaintiffs' motion for summary judgment as to Joey's warrantless entry and trespass claims under Section 1983 and state law against Officer Tim, Sergeant Zinstein, and the City will be granted.[14]

## III.    <u>FALSE ARREST CLAIMS</u>

Defendants have moved for summary judgment on Plaintiffs' Section 1983 and state law false arrest claims, and Plaintiffs have cross-moved for summary judgment on Joey's Section 1983 and state law false arrest claims.  (Def. Br. (Dkt. No. 85) at 12; Pltf. Br. (Dkt. No. 80) at 6)

---

[14]  There is no evidence that Officer Rodriguez, Officer Calzada, or Sergeant Aguilar were involved in the entry of Joey's apartment.  Accordingly, Defendants' motion for summary judgment is granted as to these Defendants with respect to Plaintiffs' trespass claim.  Because there are material issues of fact as to whether Officers Freeman and Padilla entered Joey's apartment, Defendants' motion for summary judgment on Plaintiffs' trespass claim is denied as to them.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 113-15; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶¶ 113-15)  Defendants have not moved for summary judgment on Plaintiffs' Section 1983 warrantless entry claim.

A.     **Applicable Law**

"A [Section] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007). Moreover, "[t]he common law tort of false arrest is a species of false imprisonment." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995). "Under New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" Id. (quoting Broughton v. State, 37 N.Y.2d 451, 456 (1975))

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether the action is brought under state law or under § 1983." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (citation and internal quotation marks omitted). "'[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (quoting Weyant, 101 F.3d at 852) (emphasis in Gonzalez).

"When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as [p]robable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotations and citations omitted; emphasis in original); Gonzalez, 728 F.3d at 155 ("The inquiry is limited to whether the facts known by the arresting officer at the time of the

arrest objectively provided probable cause to arrest." (internal quotation marks and citation omitted)).

Probable cause is evaluated based on the "totality of the circumstances," and "should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." Stansbury v. Wertman, 721 F.3d 84, 93 (2d Cir. 2013) (quoting Fabrikant v. French, 691 F.3d 193, 214 (2d Cir. 2012)). Courts should keep in mind, however, that "[p]robable cause is a 'fluid' standard that 'does not demand hard certainties or mechanistic inquiries'; nor does it 'demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false.'" Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016) (quoting Zalaski v. City of Hartford, 723 F.3d 382, 389, 390 (2d Cir. 2013)). "Rather, it requires only facts establishing 'the kind of fair probability' on which a 'reasonable and prudent' person, as opposed to a 'legal technician[],' would rely." Id. (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)).

## B. **Analysis**

### 1. **Joey's Arrest**

Joey was arrested inside the apartment by either Officer Tim or Officer Padilla. Sergeant Zinstein gave the order to arrest Joey, and did so after Joey told the officers that he had kicked his bedroom door, which struck his brother David in the face, injuring his nose.[15] (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 117, 118, 124)

---

[15] There is no evidence that Sergeant Aguilar, or Officers Rodriguez, Freeman, or Calzada, were involved in Joey's arrest.

Defendants contend that – in light of David's 911 call and Joey's admission that he told the police that he had kicked his bedroom door, and that the door hit David in the face, causing injury – there was probable cause to arrest Joey for assault.  (Def. Br. (Dkt. No. 85) at 14)

Plaintiffs assert, however, that David "stated clearly, in response to the 911 operator's query, that he had not been assaulted," and "did not need or want the police."  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 224, 225)  As discussed above, no recording of David's 911 call is available.  (Id. ¶ 227)

Under New York law, "[a] person is guilty of assault in the third degree when . . . [h]e recklessly causes physical injury to another person."  N.Y. Penal Law § 120.00 (McKinney).  Moreover,

> [a] person acts recklessly with respect to a result or to a circumstance described
> by a statute defining an offense when he is aware of and consciously disregards a
> substantial and unjustifiable risk that such result will occur or that such
> circumstance exists.  The risk must be of such nature and degree that disregard
> thereof constitutes a gross deviation from the standard of conduct that a
> reasonable person would observe in the situation. . . .

Id. § 15.05.  Here, there was ample probable cause to arrest Joey for assault in the third degree.

Officers reported to the scene in response to a 911 call in which David alleged that he needed an ambulance because his nose was bleeding.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 86-87)  Plaintiffs admit that David was being treated for his injuries by EMTs when the police arrived (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶ 94), and Officers Tim and Padilla observed that David had suffered facial injuries.  (Def. Add'l R. 56.1 Stmt. (Dkt. No. 94) ¶ 722)  When officers arrived at Joey's apartment, Joey told them that "he had an argument with [his brother] David, and that he – Joey – had kicked the bedroom door off its hinges . . . and it struck David in the

face injuring his nose."  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 116-17)  Sergeant Zinstein

observed the broken bedroom door laying on the floor.  (Id. ¶ 118)

In sum, the officers had an ample basis to conclude that David had suffered an

injury to his nose, and that Joey had recklessly caused that injury.  Joey admitted to arguing with

his brother, and to violently kicking the bedroom door off its hinges, such that it struck David's

face and caused injury to him.  And officers observed the bedroom door laying on the floor,

confirming Joey's account.  (Id. ¶¶ 118-19)  Given these facts and circumstances, there was

ample probable cause to arrest Joey for assault in the third degree.[16]

Plaintiffs argue, however, that probable cause does not defeat Joey's state law

false arrest claim, because "[t]he fruit of the illegal entry into Joey's home was Zinstein's and

Tim's access to Joey himself."  (Pltf. Reply Br. (Dkt. No. 83) at 13 (citing Ostrover v. City of

New York, 192 A.D.2d 115, 118 (1st Dept. 1993))  In Ostrover, the court held that "the fruit of

an illegal search cannot give rise, in a juristic sense, to probable cause to arrest . . . ."  Ostrover,

192 A.D.2d at 118.

However, more recent authority from New York's highest court has called into

question whether New York's exclusionary rule applies to a false arrest claim.  In Martinez v.

City of Schenectady, 97 N.Y.2d 78, 82, 85 (2001), New York's Court of Appeals held that the

"existence of probable cause serves as a legal justification for the arrest and an affirmative

defense to the claim" of civil false imprisonment, even where evidence establishing probable

cause was suppressed in criminal proceeding due to illegality of the underlying warrant.  At the

very least, Martinez creates sufficient ambiguity regarding New York law that the officers here

---

[16]  David's account of what he said to the 911 operator (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶
224-26) is irrelevant, because there is no evidence that his account was conveyed to the officers
who appeared at the scene and effected Joey's arrest.

would be entitled to qualified immunity. See Morrison v. City of New York, No. 14-CV-4508 (MKB), 2019 WL 4010106, at *2 (E.D.N.Y. Aug. 13, 2019) (declining to reconsider dismissal of state law false arrest claim, and describing Martinez as "a controlling decision where the New York Court of Appeals held that the existence of probable cause defeated the plaintiff's false arrest claim in his civil case even though the evidence establishing probable cause was suppressed in the plaintiff's criminal case"); Cabral v. City of New York, 662 F. App'x 11, 13 (2d Cir. 2016) (noting that "the existence of such a decision by New York's highest court would afford at least the 'reasonable basis' necessary for qualified immunity with regard to the state claim . . . ."). In sum, because there was probable cause to arrest Joey for assault in the third degree, his state law false arrest claim fails.

Plaintiffs' motion for summary judgment on Joey's Section 1983 and state law false arrest claims will be denied, and Defendants' motion for summary judgment on these claims will be granted.

### 2.   David's Arrest

The parties agree that David was placed under arrest by Office Padilla outside the apartment building, and that the arrest order was given by Sergeant Zinstein.[17] (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 157-159)

In arguing that there was probable cause to arrest David, Defendants cite his yelling outside Joey's apartment building. (Def. Br. (Dkt. No. 85) at 13) According to Defendants, David and Joey were "yelling and screaming . . . on a public sidewalk in a

---

[17] Because there is no evidence that Officers Tim, Rodriguez, Freeman, and Calzada, or Sergeant Aguilar, were involved in David's arrest, Defendants' motion for summary judgment as to David's Section 1983 and state law false arrest claims will be granted as to them.

residential neighborhood at 7:30 A.M."  Defendants contend that this behavior constitutes disorderly conduct under New York Penal Law § 240.20(2).  (Id. at 13-14)

Defendants concede, however, that "at the time that [P]laintiffs were disorderly, they had already been arrested."  (Def. Reply Br. (Dkt. No. 91) at 9)  Indeed, undisputed evidence shows that David was arrested by Officer Padilla outside on the street before Joey was brought out of the apartment building.  And it was only after officers brought Joey out of the apartment building that the brothers' yelling began.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 159, 161, 170)  Because the brothers' verbal altercation on the sidewalk happened after David's arrest, that altercation did not provide probable cause for that arrest.[18]

Defendants' motion for summary judgment on David's Section 1983 false arrest claim against Officer Padilla and Sergeant Zinstein will be denied.[19]

---

[18]  Defendants' qualified immunity argument (see Def. Br. (Dkt. No. 85) at 12-13) fails for the same reason.  Arguable probable cause to arrest exists where "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016) (internal quotation marks and citations omitted).  But given that the brothers' yelling began only after David's arrest, it is obvious that there can be no credible claim of arguable probable cause.

Defendants contend, however, that "subordinate officers carrying out . . . directive[s] of superior[s] [are] entitled to qualified immunity [where they have not] determined [the] basis for [the] order or [the] reliability of information on which it [is] based."  (Def. Br. (Dkt. No. 85) at 16 (citing Varrone v. Bilotti, 123 F.3d 75, 81 (2d Cir. 1977)))  But in Varrone, "there [was] no claim that the order was facially invalid or obviously illegal . . . ."  Varrone, 123 F.3d at 81.  Here, by contrast, there is good reason to believe that the order to arrest David was facially invalid.

Finally, Defendants argue that – even though David's arrest preceded the brothers' yelling – the yelling began in "about two minutes," which "limits damages on [David's] false arrest claim.  (Def. Reply Br. (Dkt. No. 91) at 9)  This argument is irrelevant to whether Defendants are entitled to summary judgment on David's false arrest claim.

[19]  David's state law false arrest claim against Officer Padilla and Sergeant Zinstein is addressed below.  See infra, Section X.A.

IV.  **FIRST AMENDMENT CLAIMS**

Defendants have moved for summary judgment on Plaintiffs' First Amendment claims on the ground that the arresting officers had probable cause or arguable probable cause to make the arrests.  (Def. Br. (Dkt. No. 85) at 17-18)  As explained above, there was probable cause to arrest Joey.  Accordingly, Defendants are entitled to summary judgment on Joey's First Amendment claim.  As to David, there was no probable cause to arrest.  This Court must therefore address the merits of his First Amendment claim.

On the merits, Defendants contend that "there is no evidence demonstrating any retaliatory motive or effort to silence [P]laintiffs, [or] that the officers' actions chilled their First Amendment rights."  (Id. at 18)

"To prevail on [a] free speech claim, [a] plaintiff must prove [that]:  (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right."  Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).

Plaintiffs have not explained how David's speech was chilled by Defendants' actions.  As discussed above, David's yelling on the street occurred after his arrest, and so the arrest could not have been in retaliation for his yelling.  (Def. R. 56.1 (Dkt. No. 86) ¶ 171)

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' First Amendment claims will be granted.

V.  **MALICIOUS ABUSE OF PROCESS**

Defendants contend that they are entitled to summary judgment on Plaintiffs' Section 1983 and state law "malicious abuse of process" claims, because "none of the individual defendants employed regularly issued legal process . . . against plaintiffs[,] because plaintiffs

were never prosecuted." (Def. Br. (Dkt. No. 85) at 18-20) Plaintiffs have not addressed Defendants' arguments concerning their malicious abuse of process claim in their opposition brief. Accordingly, Plaintiffs have abandoned the claim, and Defendants are entitled to summary judgment on that claim. See Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); Taylor v. City of N.Y., 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

In any event, an arrest does not amount to "regularly issued legal process" for purposes of a malicious abuse of process claim. "[L]egal process means that a court issued the process, and the plaintiff will be penalized if he violates it." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's Section 1983 and state law malicious abuse of process claims will be granted.

## VI.    DENIAL OF FAIR TRIAL AND
## FABRICATION OF EVIDENCE CLAIMS

Defendants contend that they are entitled to summary judgment on Plaintiffs' Section 1983 and state law claims for denial of a fair trial and fabrication of evidence, "because [Plaintiffs] were not prosecuted on any of the charges arising from their respective arrests . . . ." (Def. Br. (Dkt. No. 85) at 20)

In order to prevail on such claims, a plaintiff must demonstrate that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4)

forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir. 2016).

Plaintiffs argue that their "time being held in physical custody prior to the D.A.'s office declining to prosecute them satisfies the deprivation of liberty element of the claim." (Pltf. Opp. Br. (Dkt. No. 98) at 17 (citing Collins v City of N.Y., 295 F. Supp. 3d 350, 375-376 (S.D.N.Y. 2018))) Collins does not support Plaintiffs' argument.

In Collins, plaintiff was arraigned and "required to appear in court five times before she accepted an adjournment in contemplation of dismissal." Collins, 295 F. Supp. 3d at 360. Here, charges were never filed against Plaintiffs, they were never arraigned, and they were never required to appear in court. "[W]hile the . . . requirement that a plaintiff appear in court, post-arraignment, in connection with criminal proceedings, . . . constitute[s] a Fourth Amendment seizure," MacPherson v. Town of Southampton, No. 07 Civ. 3497 (DRH), 2013 WL 6058202, at *5 (E.D.N.Y. Nov. 14, 2013), there were no such proceedings here.

Accordingly, Defendants' motion for summary judgment as to Plaintiffs' Section 1983 and state law denial of fair trial and fabrication of evidence claims will be granted.

## VII.   EXCESSIVE FORCE CLAIMS

Defendants seek summary judgment on (1) David's Section 1983 excessive force claim, and (2) certain aspects of Joey's excessive force claim. (Def. Br. (Dkt. No. 85) at 22)

### A.   Applicable Law

"Where . . . [an] excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989). While law enforcement officers necessarily have the "right to use some degree of

physical coercion or threat" in effecting an arrest or investigatory stop, id. at 396, it is also well-established that "[p]olice officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable. . . ."  Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004).

Determining whether the force used was reasonable "'requires careful attention to the facts and circumstances of each particular case,'" including (1) "'[t]he severity of the crime at issue,'" (2) "'whether the suspect poses an immediate threat to the safety of the officers or others,'" and (3) "'whether he is actively resisting arrest or attempting to evade arrest by flight.'" Brown v. City of New York, 798 F.3d 94, 100 (2d Cir. 2015) (quoting Graham, 490 U.S. at 396).  Although reasonableness "'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" id. (quoting Graham, 490 U.S. at 396),  it is also "clear that the standard is one of objective reasonableness, and the officer's state of mind, whether evil or benign, is not relevant."  Id. at 100-01.

Finally, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable."  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (citing O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)).

  B.    **Analysis**

  1.    **Handcuffing Injuries**

Defendants argue that "no reasonable jury could credit plaintiffs' testimonies regarding the nature and extent of their wrist injuries or the severity of pain they were

experiencing while in custody, because plaintiffs' testimony is contradicted by the medical evidence."  (Def. Br. (Dkt. No. 85) at 23)

David alleges "pain in his hands" and "numbness and cramping" persisting until at least his May 3, 2018 deposition, as well as "carpal tunnel syndrome," and "intermittent tingling," persisting until at least a December 16, 2016 medical visit.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 431, 434, 451-52)  The parties agree that Officer Padilla handcuffed David. (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 159)

Joey alleges the following injuries from handcuffs:  an initial "cut to [his] wrist"; "tingling sensation, pain and tingling with cold, swelling, and lack of feeling in his fingers" that persisted until a medical visit six days after his arrest; and "swollen wrists" and "wrist pain" that persisted until at least February 6, 2019 deposition.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 465, 479-80, 484, 489)

"There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort."  Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008); see also Gersbacher v. City of New York, 134 F. Supp. 3d 711, 724 (S.D.N.Y. 2015) (dismissing claim for excessive force where arrestee complained about tightness of handcuffs and "cuts and bruises on his wrists")  However, a "plaintiff's testimony about the injuries and subsequent treatment alone is sufficient to support an excessive force claim on a motion for summary judgment." Pelayo v. Port Auth., 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012).

As to David, Defendants argue that "records from all of [his] [medical] encounters [while in custody] do not contain a single mention of . . . wrist or hand injuries, let alone a notation or other objective signs of wrist or hand injuries . . . ."  (Def. Br. (Dkt. No. 85) at

24)  However, Defendants do not dispute that David complained of "bilateral wrist . . . pain" at St. Barnabas Hospital on the day of his arrest.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 442)  Defendants also do not dispute that on December 16, 2016 – about a year after David's arrest – a physician at the Henry Ford Health Network diagnosed David as suffering from "carpal tunnel syndrome, right."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶ 451)  A carpal tunnel syndrome condition persisting more than a year after David's arrest would clearly constitute more than "temporary discomfort."  While Defendants dispute causation (id.), whether David's injury was caused by the tight handcuffs presents an issue of fact for a jury.

Accordingly, to the extent that David's Section 1983 excessive force claim is premised on injuries he suffered as a result of tight handcuffing, Defendants' motion for summary judgment will be denied as to Officer Padilla.[20]

As to Joey, Defendants argue that "[t]he medical records from the morning of the incident do not contain a single mention of any subjective complaints of wrist or hand pain . . . apart from an abrasion . . . ."  (Def. Br. (Dkt. No. 85) at 24)  However, Joey testified at his deposition that he complained of wrist pain at St. Barnabas Hospital, six days after his arrest.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 484, 490)  Joey also testified that as of his May 1, 2018 deposition, he was still experiencing wrist pain and limited function as a result of the handcuffing.  (Id. ¶¶ 494-95)  This evidence is sufficient to create a material issue of fact as to whether Joey's injuries from the handcuffing constitute more than "temporary discomfort."  See Pelayo, 893 F. Supp. 2d at 642.

---

[20]  Defendants' motion will be granted as to all other individual Defendants, because there is no evidence that they played any role in handcuffing David.

There is a factual dispute as to which officer handcuffed Joey. Officer Tim states that he handcuffed Joey (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶ 126), but Joey maintains that he was handcuffed by Officer Padilla, who is listed as the arresting officer on Joey's arrest report. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶¶ 115, 126 (citing Rothman Decl. (Dkt. No. 97-20) at 3))

Accordingly, to the extent that Joey's Section 1983 excessive force claim is premised on injuries he suffered as a result of tight handcuffing, Defendants' motion for summary judgment will be denied as to Officers Tim and Padilla.[21]

### 2.   David's Nose Injury

Defendants seek summary judgment on David's Section 1983 excessive force claim to the extent that claim is premised on David's nose injury, arguing that David's injury was caused by his own "carelessness" in "bumping his nose onto the [police] car's door frame." Defendants note that, at deposition, David did not testify that the officers "slammed" his face into the police vehicle. (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶ 265 (citing D. Fernandez Dep. (Dkt. No. 88-6) at 71-72)) David instead testified that the officers "were pushing and shoving, and as they were trying to force me into the squad car I hit my nose again onto the squad []car . . . ." (D. Fernandez Dep. (Dkt. No. 88-6) at 71:21-23) Defendants further maintain that, in any event, this injury did not result in more than "temporary discomfort and bleeding." (Def. Br. (Dkt. No. 85) at 27-28)

Plaintiffs cite St. Barnabas Hospital records in support of their assertion that "Padilla and the other John Doe Officer slammed David's face into the police car." (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶ 265 (citing Rothman Decl., Ex. 14 (Dkt. No. 97-6) at 1)) An X-ray

---

[21] Defendants' motion will be granted as to all other individual Defendants, because there is no evidence that they played a role in handcuffing Joey.

examination performed at St. Barnabas the day of David's arrest shows a "[b]ilateral nasal bone fracture without displacement," and medical records from an examination conducted about a week after the arrest refer to "head trauma."  (Def. R. 56.1 Cntrstmt. (Dkt. No. 94) ¶¶ 443, 449)

The medical records support David's claim that his nose injury was not incidental, but was instead traumatic and the product of considerable force.  Moreover, David's deposition testimony is not inconsistent with the notion that his nose injury was caused by the officers' use of force.  The Court concludes that there are material issues of fact as to how David sustained his nose injury and the severity of the nose injury.  Accordingly, to the extent that David's Section 1983 excessive force claim is premised on his nose injury, Defendants' motion for summary judgment will be denied as to Officer Padilla, who is the only Defendant implicated in David's nose injury.[22]

### 3.      Joey's Other Injuries

As discussed above, it is undisputed that Joey was placed in a chokehold and punched after he was put inside a police vehicle; that he was subsequently removed from the police vehicle and struck the ground; that he was kicked at least "a couple" of times while on the ground; and that he was then carried by officers to a second police vehicle.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 143, 147, 149)  Joey further contends, however, that before he was put into the first police vehicle, two unidentified officers "came from out of nowhere, and tackled [him] to the ground[,]" "punched [him] in the body[,]" and "kept trying to pick [him] up by the handcuffs

---

[22]  Defendants' motion will be granted as to all other individual Defendants, because there is no evidence that they played a role in causing David's nose injury.  The Court notes that liability cannot be predicated on a failure to intervene theory.  Assuming arguendo that David's account of the incident is correct, the "slam" he describes would have occurred too quickly for other officers to intervene.  See O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988) (an officer who "ha[s] no realistic opportunity to attempt to prevent [the use of excessive force]" cannot be found liable on a failure to intervene theory).

. . . ."  Joey also asserts that after he was beaten in the first police vehicle, he was dragged out of

that vehicle and fell onto his back on the ground; that he was repeatedly kicked and beaten while

on the ground; and that upon arrival at the 42nd Precinct he was thrown to the floor and beaten

while laying there.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 293-96, 334-45, 353-54, 363)

        Joey claims that all of the force used against him was excessive (Pltf. Opp. Br.

(Dkt. No. 98) at 19), and that as a result of the officers' actions he sustained a forehead

contusion; a left ear abrasion; minor head trauma and a concussion; forehead bruising; and back

pain.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 467-73, 477-487)

        As an initial matter, Defendants argue that Joey's claim that he was beaten while

outside the first police vehicle is refuted by his February 16, 2017 testimony at a New York State

§ 50-h hearing – a hearing required under New York law before claims against the City may be

brought.  At the hearing, Joey testified that "after I was put in the car, the force happened."  (Def.

R. 56.1 Cntrstmt. (Dkt. No. 94) ¶ 293)  Defendants further argue that an errata sheet submitted

by Joey on August 8, 2017 – in which Joey claims that excessive force was used both before and

after he was put in the first police vehicle – should not be acknowledged by this Court.  (Id.

(citing Klausner v. United States, No. 06 Civ. 5005 (BMC), 2008 WL 11417278, at *2

(E.D.N.Y. Jan. 3, 2008)))  But Klausner involved a witness's "failure to timely deliver her errata

sheets," Klausner, 2008 WL 11417278, at *2; no such failure is alleged here.  In sum, Joey's §

50-h hearing testimony does not preclude his claim that he was beaten before being put inside the

first police vehicle.

        Defendants also complain that Joey has not identified the officers who allegedly

(1) beat him before he was placed in the first police vehicle; (2) dragged him out of the first

police vehicle and then beat him as he laid on the ground; and (3) beat him at the 42nd

Precinct.[23]  (Def. Br. (Dkt. No. 85) at 29)  Plaintiffs argue that the fact "[t]hat Plaintiffs do not

know the identities of those who beat and abused them amongst a group of officers does not

prevent joint and several liability."  (Pltf. Opp. Br. (Dkt. No. 98) at 20)  Plaintiffs argue that it is

not necessary for them to identify the officers who beat Joey, because all officers present could

be liable on a failure to intervene theory.  (Id.)

There has been full discovery in this case, however, and we are now at summary

judgment.  For Joey's Section 1983 excessive force claim to proceed further as to the alleged

beatings outside the first police vehicle and at the 42nd Precinct, Plaintiffs must offer evidence

demonstrating which of the named Defendant officers was involved.

"[I]n order to proceed under a theory that the defendants either participated in or

failed to intervene in another officer's use of excessive force, a plaintiff must establish, at a

minimum, [that] the particular defendant was in a position to intervene."  Gonzalez v. Waterbury

Police Dep't, 199 F. Supp. 3d 616, 623 (D. Conn. 2016); see also Smith v. P.O. Canine Dog

Chas, No. 02 6240 KMW DF, 2004 WL 2202564, at *8 (S.D.N.Y. Sept. 28, 2004) ("In order to

avoid summary judgment on a claim for excessive force, a plaintiff must demonstrate that the

evidence at least raises a genuine factual question as to whether each defendant police officer

was personally involved in the use of the claimed excessive force.")  Here, Plaintiffs have made

only conclusory and non-individualized assertions as to which officers were involved in the

alleged beatings and/or were in a position to intervene to stop the beatings.[24]  These conclusory

allegations are not sufficient to withstand summary judgment.

---

[23]  Defendants acknowledge that Joey has identified Officers Tim and Freeman, and Sergeant
Zinstein, as having used excessive force inside the first police vehicle.  (Def. Reply Br. (Dkt. No.
91) at 12)
[24] For example, Plaintiffs assert that "[m]ultiple John Doe[] members of the NYPD were helping
their NYPD colleagues to force Joey into a police car"; "John Doe[] Members of the NYPD

In sum, to the extent that Joey's Section 1983 excessive force claim is premised on injuries he suffered inside the first police car at the hands of Officers Tim and Freeman, and Sergeant Zinstein, Defendants' motion for summary judgment will be denied. Defendants' motion will be granted as to the alleged beatings that preceded and followed Joey being placed in the first police vehicle, including at the 42nd Precinct.[25]

## VIII.   SUPERVISORY LIABILITY CLAIMS

Plaintiffs have alleged that Sergeants Zinstein and Aguilar "fail[ed] to remedy the wrongs committed by their subordinates, and [failed] to properly train, screen, supervise, or discipline their subordinates. . . ."  (SAC (Dkt. No. 29) ¶ 73)  Defendants argue that they are entitled to summary judgment on these supervisory liability claims.  (Def. Br. (Dkt. No. 85) at 29)

"'[S]upervisors cannot be held liable based solely on the alleged misconduct of their subordinates.'"  Vasquez v. Reilly, No. 15-CV-9528 (KMK), 2017 WL 946306, at *11 (S.D.N.Y. Mar. 9, 2017) (quoting Lindsey v. Butler, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014)). "'Because vicarious liability is inapplicable to . . . § 1983 suits,' [plaintiff] must raise a genuine dispute as to whether 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  Victory v. Pataki, 814 F.3d 47, 67 (2d Cir. 2016) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)) (emphasis omitted).  However, the personal involvement and thus liability of a supervisor may be established by showing that

---

present at the scene then beat Joey up and placed him inside of a car"; and "[t]hat other John Doe male member of the NYPD, and other John Doe[] members of the NYPD, also pulled Plaintiff out of the car in an aggressive manner. . . ."  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 289, 293, 334)

[25] There is no evidence that Officers Rodriguez, Calzada, or Padilla, or Sergeant Aguilar, engaged in any of the alleged incidents of excessive force.  Accordingly, Defendants' motion for summary judgment will be granted as to these Defendants.

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

Here, there is sufficient evidence of Sergeant Zinstein's awareness of the force allegedly being used inside and outside the first police vehicle.  There is evidence that Sergeant Zinstein was present when Joey was placed in the first police vehicle, that he used excessive force against Joey inside that vehicle, and that he remained in the vicinity thereafter.  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 606-11)  Given Sergeant Zinstein's alleged use of force, and proximity to other officers' alleged use of force, there is a material issue of fact as to whether he was "grossly negligent in supervising subordinates" or "exhibited deliberate indifference." Colon, 58 F.3d at 873.  Because the supervisory liability inquiry focuses on Sergeant Zinstein's "own individual actions," Victory, 814 F.3d at 67, Plaintiffs' inability to identify the other officers who allegedly perpetrated the beatings is not fatal to the supervisory liability claim.

With respect to Sergeant Aguilar, it is undisputed that he was the desk sergeant at the 42nd Precinct on the day of the incident, and that he was never at 1199 Boston Road.  (Def. R. 56.1 Stmt. (Dkt. No. 86) ¶¶ 99-100)  Accordingly, he can only be liable with respect to conduct that occurred after Plaintiffs arrived at the precinct.  Sergeant Aguilar directed Plaintiffs to be put into cells while rear-handcuffed and left that way.  He was in the vicinity and aware that they were "yelling out while they were in the cells."  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 663-69)  There is no evidence that Sergeant Aguilar was aware that Plaintiffs were yelling out because of pain caused by their handcuffs, however.  (Id. ¶ 670)

Accordingly, Defendants' motion for summary judgment on Plaintiff's supervisory liability claims will be denied as to Sergeant Zinstein but granted as to Sergeant Aguilar.

## IX.    MONELL CLAIM

Defendants seek summary judgment on Plaintiffs' Monell claim against the City. (Def. Br. (Dkt. No. 85) at 30-31)  The Monell claim is premised largely on a January 25, 2019 Report of the Independent Panel on the Disciplinary System of the New York City Police Department, available at https://www.independentpanelreportnypd.net/assets/report.pdf (the "Report").  (Pltf. Opp. Br. (Dkt. No. 98) at 22-23 (citing Report))

The Report addresses the NYPD's disciplinary process, analyzing cases handled by the Civilian Complaint Review Board ("CCRB") from 2016 through 2018.  (Report at 5-6, 13)  Plaintiffs contend that the Report "makes a number of findings concerning unnecessary and excessive delay in the NYPD's disciplinary processes."  (Pltf. Opp. Br. (Dkt. No. 98) at 23)  The Report finds, inter alia, that (1) while the NYPD "has recently made significant progress in more timely resolution of disciplinary cases[,] [t]here is . . . room for more improvement and a number of apparent ways to achieve it.  [The NYPD's Department Advocate's Office ("DAO")] is significantly understaffed . . . ."; and (2) "decision making within DAO is . . . highly centralized in a manner that creates bottlenecks and slows the resolution of cases."  (Report at 6)

Plaintiffs argue that because of these "systemic deficiencies[,] . . . investigations into the individual Defendants [] were initiated (some many years ago) but never completed (they are still listed as 'open allegations'), and the individual Defendants, when questioned at their depositions, often knew nothing whatsoever about the fact that they had been suspected of or accused of wrongdoing. . . ."  (Pltf. Opp. Br. (Dkt. No. 98) at 22)

For the five-year period between 2007 and 2012, Plaintiffs have offered evidence of two open allegations of prisoner injury/unnecessary force against each of Officer Tim and Officer Freeman, and one such open allegation as to Sergeant Zinstein.[26] (See Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 682, 688, 694, 697, 705; July 8, 2019 Rothman Decl, Ex. 29)

### A.   **Applicable Law**

A municipality can only be held liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, [causes a constitutional deprivation]." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A plaintiff pursuing a Monell claim

> must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officers. Second, the plaintiff must establish a causal connection – an "affirmative link" – between the policy and the deprivation of his constitutional rights.

Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).

"A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. . . . To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall

---

[26] Open allegations against Sergeant Aguilar and Officer Calzada are irrelevant, because there is no evidence here that they used excessive force. There are no open allegations of any sort as to Officers Rodriguez and Padilla. (Id. ¶ 672)

further incidents." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (citations omitted).

      **B.**    **Analysis**

      As an initial matter, a report issued on January 25, 2019, could not have put the City on notice – as of November 3, 2015, when the incident at issue took place – that NYPD officers were routinely using excessive force in arresting suspects. (Report; Pltf. R. 56.1 Stmt. (Dkt. No. 79) ¶ 1) Plaintiffs also cite no case law suggesting that a small number of open and unsubstantiated allegations regarding a defendant police officer – over a six year period – is sufficient to permit a Monell claim premised on excessive force to survive summary judgment.

      With respect to the use of retrospective reports, courts have consistently rejected the notion that a report issued long after the events in question could have put the City on notice of a policy that was causing constitutional deprivations. For example, in connection with an October 1, 2015 report issued by the NYPD's Office of Inspector General ("OIG") regarding use of force, numerous courts found that the report was not sufficient to permit Monell claims to survive summary judgment. Hanson v. New York City, No. 15-CV-1447 (MKB), 2018 WL 1513632, at *20-21 (E.D.N.Y. Mar. 27, 2018) (noting that plaintiff identified deficiencies that "are not sufficiently specific" and "fail[ed] to demonstrate any causal link between those general deficiencies and the alleged excessive exercise of force"; that "no reasonable jury could find, based on the [r]eport alone, that the City was on notice of the deficiencies . . . as the [r]eport was not issued until [two years later]"; Boddie v. City of New York, No. 15-CV-4275, 2016 WL 1466555, at *3-5 (S.D.N.Y. Apr. 13, 2016) (noting that "the incident at issue in this case took place six months before the publication of the report"; "[a] report recommending improvements to an existing training program . . . does not, without more, give rise to a plausible inference of

deliberate indifference"); see also Fabian v. City of New York, No. 16-CV-5296-GHW, 2018 WL 2138619, at *7 (S.D.N.Y. May 9, 2018) (granting the City summary judgment on a Monell claim; finding that the OIG "report itself is not evidence that any link suggested by the report between the small number of substantiated complaints and the deficient training programs was obvious to the City" at the time of the incidents at issue).

No court has ruled that the Report creates a material issue of fact so as to require that a Monell claim premised on excessive force proceed to trial. And Plaintiffs have cited no case suggesting that the mere fact that defendant officers have open and unsubstantiated allegations of excessive force pending against them is sufficient to permit a Monell claim to proceed to trial.

Moreover, the Report does not demonstrate that the City made "no meaningful attempt . . . to investigate or to forestall further incidents." Vann, 72 F.3d at 1049. To the contrary, the Report acknowledges that there has been "significant progress in more timely resolution of disciplinary cases." (Report at 6) Rather than recommending a wholesale overhaul of the NYPD's complaint resolution and disciplinary system, the Report merely "recommends that DAO consider hiring at least 10 additional attorneys, filling other executive staff and supervisory positions, and implementing greater delegation of DAO decision making"; implementing "a 'fast track' review or settlements involving less serious offenses"; and "limit[ing] the number of cases that it asks CCRB to reconsider . . . ." (Report at 6-7) Finally, the time period addressed in the Report – 2016 to 2018 – does not cover either the date of the incident at issue (November 3, 2015) or the time period for which certain individual Defendants have open allegations – 2007 to 2012.

Jenkins v. City of New York, 388 F. Supp. 3d 179 (E.D.N.Y. 2019) – cited by Plaintiffs (Pltf. Opp. Br. (Dkt. No. 98) at 22) – is not to the contrary.  In Jenkins, the court denied the City's motion for summary judgment on a Monell claim, concluding that "[a] reasonable jury could find that [plaintiff's] injuries were foreseeable given the City's failure to adequately investigate allegations against [the defendant officer] and to take appropriate measures to supervise and discipline him."  Jenkins, 388 F. Supp. 3d at 193.  There were "30 complaints filed against [the defendant officer in Jenkins, however], many alleging conduct strikingly similar to the claims alleged yet again in this litigation. . . ."  Id. at 188.  There is no such record here.

Officer Padilla's alleged conduct accounts for most of the excessive force claims that survive summary judgment, and Padilla has no open allegations of misconduct.  Over a five-year period, Officers Tim and Freeman, and Sergeant Zinstein, have a combined total of five force-related unsubstantiated complaints against them, as discussed above.  (See Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 96) ¶¶ 682, 688, 694, 697, 705; July 8, 2019 Rothman Decl, Ex. 29)  There is no evidence that any of the open allegations concerning Defendants Tim, Freeman, and Zinstein involve conduct and circumstances similar to that at issue here.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' Monell claim will be granted.

## X.    STATE LAW CLAIMS

Defendants seek summary judgment on all of Plaintiffs' state law claims, arguing that "David failed to comply with the requirements of General Municipal Law § 50-h," and that both Plaintiffs' state law claims fail on their merits.  (Def. Br. (Dkt. No. 85) at 32)

### A.    David's Alleged Failure to Comply with Notice of Claim Requirements

New York General Municipal Law §50-h provides that

>Wherever a notice of claim is filed against a city, . . . the city . . . shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate . . . . Where a demand for examination has been served . . . no action shall be commenced against the city . . . against which the claim is made unless the claimant has duly complied with such demand for examination . . . . If such examination is not conducted within ninety days of service of the demand, the claimant may commence the action.  The action, however, may not be commenced until compliance with the demand for examination if claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.  If the claimant requests an adjournment or postponement beyond the ninety day period, the city . . . shall reschedule the hearing for the earliest possible date available.

N.Y. Gen. Mun. Law § 50-h (McKinney).

"Notice of claim requirements are construed strictly by New York state courts. . . . Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action."  Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 793–94 (2d Cir. 1999) (citations and internal quotation marks omitted).  "Disregarding any proffered reason [for a failure to comply] is also good policy:  while the City must handle the rescheduling of thousands of 50-h Hearings, a plaintiff is only concerned with her own and is in a better position to ensure that the parties are on the same page.  For these reasons, Plaintiff's failure to attend the 50-h Hearing – no matter the reason – is a complete bar to his state law claims against the City."  Gilliard v. City of New York, No. 10. Civ. 5187 (NGG), 2013 WL 521529, at *16 (E.D.N.Y. Feb. 11, 2013).

On November 16, 2015, Joey and David filed a notice of claim in connection with their November 3, 2015 arrests.  (Def. R. 56.1. Stmt. (Dkt. No. 86) ¶ 70)  On January 9, 2016, the City "served notice on plaintiffs' attorney" for David to appear at a § 50-h hearing.  (Id. ¶ 71)  Plaintiffs' attorney made three adjournment requests.  Then, on February 15, 2017, he requested a further adjournment of the scheduled February 16, 2017 hearing date, explaining that David

lived in Michigan.  (Id. ¶ 72; Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 72)  Joey appeared for the

February 16, 2017 hearing, but David did not.  (Def. R. 56.1. Stmt. (Dkt. No. 86) ¶¶ 73-74)

Defendants represent that David's claim was "administratively closed" after his

failure to appear for the February 16, 2017 hearing.  (Id. ¶ 74)

Plaintiffs complain that,

> [a]s far as David and his counsel knew, David's 50-h hearing was going to be
> rescheduled for another date, just as the City had done three times previously.
> David was never provided with any notice by the City that they were not going to
> reschedule his hearing, and no one ever informed David or his counsel that the
> claim was "administratively closed."

(Pltf. R. 56.1 Cntrstmt. (Dkt. No. 96) ¶ 74)  Accordingly, Plaintiffs do not dispute that David

failed to appear for the § 50-h hearing.  Instead, they say that they were waiting for the

Comptroller's Office to respond to David's February 15, 2017 adjournment request, and set

another date for the § 50-h hearing.  (Pltf. Opp. Br. (Dkt. No. 98) at 24)

Courts have held, however, that a plaintiff cannot avoid application of the § 50-h

hearing requirement and bar by requesting an adjournment to which the defendant does not

agree.  See Johnson v. City of New York, No. 15 CIV. 6915 (ER), 2019 WL 294796, at *14-15

(S.D.N.Y. Jan. 23, 2019) (dismissing state law claims for failure to attend § 50-h hearing; finding

"quintessential factual disputes concerning whether [plaintiff's] representative did, in fact,

request an adjournment," but noting that "the [c]ourt does not find these factual disputes

material"); Maggio v. Palmer, 810 F. Supp. 50, 52 (E.D.N.Y. 1993) (dismissing state law claims

after finding that "there is no dispute that defendants did not agree to adjourn the [§ 50-h]

deposition," despite four prior adjournment requests that were granted); see also Duncan v. City

of New York, No. 11-CV-3901(ENV) (JO), 2018 WL 3421312, at *3 (E.D.N.Y. July 13, 2018)

(plaintiff claimed that he never received the City's § 50-hearing demand; court ruled that, even

assuming the truth of plaintiff's assertion, it "would not, under prevailing law, excuse plaintiff's

failure to meet the condition precedent that requires his attendance at an oral examination under oath").

Given the "strict" construction applicable to §50-h hearing requirements (see Hardy, 164 F.3d at 793-94), David's explanation as to why he did not appear for his § 50-h hearing is irrelevant. Gilliard, 2013 WL 521529, at *16. The fact that David did not attend a § 50-h hearing is dispositive of his state law claims.

Defendants' motion for summary judgment as to David's state law claims will be granted.

## B.     Joey's Remaining State Law Claims

Defendants contend that they are entitled to summary judgment on all of Joey's remaining state law claims.[27]   (Def. Br. (Dkt. No. 85) at 33)

Plaintiffs have cross-moved for summary judgment on Joey's claim under Article I, § 12 of the New York State Constitution.  (Pltf. Br. (Dkt. No. 80) at 16)

### 1.     Negligence

Defendants argue that Plaintiffs "may not base a claim for negligence on intentional conduct."  (Def. Br. (Dkt. No. 85) at 34)

Plaintiffs argue that they may plead in the alternative under Rule 8.  (Pltf. Opp. Br. (Dkt. No. 98) at 24 (citing Fed. R. Civ. P. 8(a)(3)))

This case is now at summary judgment, and accordingly Plaintiffs' Rule 8 arguments are irrelevant.  "When a plaintiff asserts excessive force and assault claims which are premised on defendant's allegedly intentional conduct, a negligence claim with respect to the

---

[27]  This Court has already addressed Joey's state law claims for false arrest and false imprisonment, malicious abuse of process, denial of a fair trial, and fabrication of evidence.

same conduct will not lie." Dineen v. Stramka, 228 F.Supp.2d 447, 454 (S.D.N.Y. 2002) (granting defendant summary judgment on plaintiff's negligence claim); see also Bah v. City of New York, No. 13-CV-6690 (PKC), 2017 WL 435823, at *4 (S.D.N.Y. Jan. 31, 2017) (same). Here, Plaintiffs have brought state law assault and battery claims that are premised on allegedly intentional conduct.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' negligence claim.

### 2.      Intentional or Negligent Infliction of Emotional Distress

"New York law explicitly bars recovery for negligent or intentional infliction of emotional distress when such claims are based on conduct that is 'embraced by a traditional tort remedy.'" Poulos v. City of New York, No. 14 Civ. 3023 (LTS), 2015 WL 5707496, at *10 (S.D.N.Y. Sept. 29, 2015) (quoting E.E.O.C. v. Die Fliedermaus, 77 F.Supp. 2d 460, 472 (S.D.N.Y. 1999)). Here, Plaintiffs have alleged traditional torts, including assault and battery.

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims for intentional or negligent infliction of emotional distress.

### 3.      New York State Constitutional Claims

#### a.      Speech Claim

Defendants argue that they are entitled to summary judgment on Plaintiffs' free speech claims under Article I, § 8 of the New York State Constitution, because an adequate alternative remedy exists for these claims. (Def. Br. (Dkt. No. 85) at 35)

"[Plaintiffs] do[] not allege specific facts to support [their state constitutional claims], and, as best as the Court can tell, the[] claims duplicate [their] other claims. 'District courts in this circuit have consistently held that there is no private right of action under the New

York State Constitution where, as here, remedies are available under § 1983.'" <u>Hershey v. Goldstein</u>, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013) (quoting <u>Campbell v. City of N.Y.</u>, No. 09 Civ. 3306 (FB), 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011)).

   Citing <u>Rotundo v. Vill. of Yorkville</u>, 2011 WL 838892 (N.D.N.Y. Mar. 4, 2011), Plaintiffs contend that their state law speech claim is "not merely duplicative" of their First Amendment claim, because New York "'generally affords greater protection than the United States Constitution with regard to speech.'"  (Pltf. Opp. Br. (Dkt. No. 98) at 25 (quoting <u>Rotundo</u>, 2011 WL 838892, at *4 n.8)  But <u>Rotundo</u> goes on to state that "claims of free speech retaliation under Article I, section 8 of the New York State Constitution are governed by the same principles that apply under the First Amendment to the United States Constitution." <u>Rotundo</u>, 2011 WL 838892, at *4 n.8.  There is thus no reason to believe that Plaintiffs' speech-related claims are stronger under New York law than they are under the First Amendment.

   Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claim under Article I, § 8 of the New York State Constitution.

### b.   Unreasonable Search Claim

   Plaintiffs and Defendants have cross-moved for summary judgment as to Joey's claim under Article I, § 12 of the New York State Constitution.  Plaintiffs make their motion "[i]n the event . . . that the Court holds that a damages remedy is unavailable to [Joey] under the Fourth Amendment . . . against Zinstein and Tim."  (Pltf. Br. (Dkt. No. 80) at 16)  Defendants argue that they are entitled to summary judgment because an adequate alternative remedy exists for these claims.  (Def. Br. (Dkt. No. 85) at 35)

   As discussed above, this Court has granted Plaintiffs' motion for summary judgment as to Joey's Fourth Amendment claim for warrantless entry.  Plaintiffs have not

articulated any theory on which Joey would be entitled to a damage award under Article I, § 12, of the New York State Constitution, but not under Section 1983. Accordingly, Plaintiffs have not demonstrated that the remedies available to Joey under Section 1983 are inadequate "to protect the interests at stake." Because Joey has an adequate remedy in federal law, his state constitutional claim fails. See Mesa v. City of New York, No. 09 CIV. 10464 JPO, 2013 WL 31002, at *33 (S.D.N.Y. Jan. 3, 2013) (granting defendants summary judgment, and noting that "while the New York Court of Appeals has recognized a limited private right of action for violations of the search and seizure provisions of the state constitution, the remedy is unavailable 'where an alternative remedy will adequately protect the interests at stake'") (quoting Coakley v. Jaffe, 49 F.Supp.2d 615, 628-29 (S.D.N.Y. 1999)).

Plaintiffs' motion for summary judgment as to Joey's claim under Article I, § 12 of the New York State Constitution will be denied, and Defendants' motion for summary judgment on this claim will be granted.

## XI.   MOTION TO SEAL

Defendants seek to seal disciplinary records for the named individual Defendants, as well as all references to those documents in Plaintiffs' Rule 56.1 statement. (Aug. 5, 2019 Ltr. Mot. to Seal (Dkt. No. 95))

### A.   Applicable Law

The Second Circuit has articulated a three-step process for determining whether documents should be placed under seal. First, a court must determine whether the presumption of access attaches. A presumption of access attaches to any document that is a "judicial document" – i.e., an "item . . . relevant to the performance of the judicial function and useful in the judicial process." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 115 (2d Cir. 2006) (quoting United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995) ("Amodeo I") (internal

quotation marks omitted)).  "[T]he mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." Amodeo I at 145.

When the document at issue is a "judicial document," however, the court must then determine the weight of the presumption of access.  "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.  Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."  Lugosch, 435 F.3d at 119 (quoting United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995) ("Amodeo II") (internal quotation marks omitted)).

Finally, after determining the weight of the presumption of access, the court must "balance competing considerations against it."  Id. at 120 (quoting Amodeo II at 1050 (internal quotation marks omitted)).  "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.'"  Id. (quoting Amodeo II at 1050).

Generally, there is a strong presumption of access to "judicial documents," because they will "directly affect" the Court's adjudication of this case.  See, e.g., Standard Inv. Chartered, Inc. v. Nat'l Assn. of Sec. Dealers, Inc., No. 07 Civ. 2014, 2008 WL 199537, at *3, 16 (S.D.N.Y. Jan. 22, 2008) (quoting Amodeo II, 71 F.3d at 1049).  To rebut the strong presumption of access, a party seeking sealing must offer specific facts "'demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"

Lugosch, 435 F.3d at 120 (quoting In re New York Times Co., 828 F.2d 110, 116 (2d Cir. 1987)).

     **B.**    **Analysis**

        Defendants concede that under the first step of the Lugosch analysis, the documents at issue "are judicial documents for the most part."  Defendants contend, however, that under the second step of the analysis, the presumption of access is weak, because the Monell claim to which these documents relate is "extremely weak."  (Aug. 5, 2019 Ltr. Mot. to Seal (Dkt. No. 95) at 2)  As to the third step, Defendants argue that the officers have "a significant privacy interest in their personnel records," as recognized by Section 50-a of New York Civil Rights Law.  (Id. at 3)

        As to the first step of the Lugosch analysis, this Court finds that the documents at issue are judicial documents, since they have some minor relevance in deciding Defendants' motion for summary judgment on Plaintiffs' Monell claim.  Accordingly, there is a presumption of access.

        As to the second step – the strength of the presumption – this Court agrees with Defendants that the Monell claim is "extremely weak," and – for the reasons explained above – finds that Defendants' disciplinary records were not significant in resolving Defendants' motion. Indeed, most of the records came "within [the] [C]ourt's purview solely to insure their irrelevance." Lugosch, 435 F.3d at 119.

        Finally, as to the third step, this Court finds that the individual Defendants have a significant privacy interest in their disciplinary records, particularly given that the allegations of misconduct against them have not been substantiated.  This Court acknowledges, however, that Section 50-a is not given controlling weight in making decisions about sealing.  See, e.g.,

Collado v. City of New York, 193 F. Supp. 3d 286, 290 (S.D.N.Y. 2016) ("while Section 50-a arguably weighs in favor of confidentiality, its importance wanes considerably where, as here, the records in issue are unquestionably relevant").

Given that Defendants' disciplinary records have only slight relevance here, and contain unsubstantiated allegations of misconduct, Defendants' privacy interests trump the presumed right of access to judicial documents. In re Gen. Motors LLC, No. 14-MD-2543 (JMF), 2015 WL 9480477, at *1 n. 1 (S.D.N.Y. Dec. 29, 2015) ("Given the Court's ruling, the limited role that the documents themselves played in that ruling, and the fact that the letters contain unsubstantiated and anonymous accusations with respect to third parties, the documents will remain under seal.").

Defendants' motion to seal will therefore be granted.

## CONCLUSION

Plaintiffs' motion for summary judgment (Dkt. No. 77) on Joey's warrantless entry and trespass claims under Section 1983 and state law is granted as to Officer Tim, Sergeant Zinstein, and the City. Plaintiffs' motion for summary judgment is otherwise denied.

Defendants' motion for summary judgment (Dkt. No. 84) is granted as to (1) Joey's Section 1983 and state law false arrest claims; (2) David's Section 1983 and state law false arrest claims as to Officers Tim, Rodriguez, Freeman, and Calzada, and Sergeant Aguilar; (3) Plaintiffs' First Amendment claims; (4) Plaintiffs' Section 1983 and state law malicious abuse of process claims; (5) Plaintiffs' Section 1983 and state law denial of fair trial and fabrication of evidence claims; (6) Plaintiffs' Section 1983 excessive force claims, except as to David's claim against Officer Padilla for tight handcuffing and a nose injury, Joey's claim against Officers Tim and Padilla for tight handcuffing, and Joey's claim against Officers Tim and Freeman, and Sergeant Zinstein, for injuries suffered inside the first police car; (7) Plaintiffs'

supervisory liability claim, except as to Sergeant Zinstein; (8) Plaintiffs' <u>Monell</u> claim; (9)

David's state law claims; and (10) Joey's state law claims for negligence, negligent and

intentional infliction of emotional distress, and under Article I, §§ 8 and 12 of the New York

State Constitution.  Defendants' motion for summary judgment is otherwise denied.

       Defendants' motion to seal (Dkt. No. 95) is granted.

       The Clerk of Court is directed to terminate Defendants Rodriguez, Calzada, and

Aguilar as defendants, and to terminate the motions (Dkt. Nos. 77, 84, 95).

       This matter is scheduled for trial on **July 20, 2020**.  The joint pretrial order,

motions in <u>limine</u>, requested <u>voir dire</u>, and requests to charge are due on **June 22, 2020**.

Responsive papers are due **June 29, 2020**.  The parties are directed to consult this Court's

Individual Rules as to the contents of these materials.

Dated:  New York, New York
     April 30, 2020

               SO ORDERED.

               _____
               Paul G. Gardephe
               United States District Judge